BOWEN v. METROPOLITAN LIFE INS. CO.—67 S. W. (2d) 164.

Eastern Section.   July 1, 1933.

Petition for Certiorari denied by Supreme Court, October 14, 1933.

Kennerly & Key, of Knoxville, for appellant.
Bowen & Bowen and B. H. Duncan, all of Knoxville, for appellee.

SENTER, J. By this suit Andrew J. Bowen, complainant, seeks a recovery of the defendant for the sum of $57.60 representing two monthly total and permanent disability benefits provided in a certificate issued in connection with a policy of group life insurance. The benefits referred to being for the months of November and December, 1931.

Complainant alleges, in substance, that on and prior to November 1, 1928, he was an employee of the Knoxville Power & Light Company, and insured under a policy of group life insurance issued by the defendant to said power and light company. That the policy and certificate issued in connection therewith provided for the payment of indemnity in case an employee insured thereunder should become totally and permanently disabled; that on November 1, 1928, complainant sustained an injury while in the course of his employment with said company, "and which has disabled him from assuming his former duties, and which he has been advised by reputable physicians that his disability is total and permanent." Complainant also sought to recover the statutory penalty because of the failure of defendant "to pay this just claim within proper time." Other allegations are contained in the bill, but need not be noticed at this time. The cer-

tificate issued by the defendant to complainant in connection with the policy of group insurance was made an exhibit to the bill, but the group insurance policy was not so exhibited.

The defendant filed a demurrer setting forth several grounds, but it is conceded by defendant that it now relies on only the first two grounds of the demurrer. The first two grounds of the demurrer are as follows:

"1. Because there is no equity upon the face of the bill.

"2. Because the bill states no cause of action under the policy of insurance exhibited to the bill against this defendant."

The demurrer was overruled by the chancellor, and to the action of the chancellor in overruling the demurrer, the defendant excepted.

The defendant then filed its answer. The answer admits that the defendant issued and delivered to the Electric Bond & Share Company its policy of group life insurance No. 3323G, by the terms of which the employees of said Electric Bond & Share Company, and its associated and affiliated corporations, one of which was the Knoxville Power & Light Company, were privileged to obtain insurance upon their lives in accordance with a schedule attached to and made a part of said group policy. The answer then states: "A full, true and correct copy of said group policy is filed herewith, marked Exhibit No. 1 to this answer, and made a part hereof as fully as if copied herein." The answer further alleges that complainant, while an employee of the said Knoxville Power & Light Company, or its successor, Tennessee Public Service Corporation, made application for and obtained insurance upon his life in the initial sum of $1,000, said insurance being granted by the defendant under the terms and subject to the conditions of said group policy, "Exhibit No. 1 hereto, as evidence thereof the defendant issued and caused to be delivered to complainant its certificate No. 1347, which is the certificate which is attached to the original bill in this cause and made a part thereof."

The answer further alleges that according to defendant's information and belief, which is believed to be true, the complainant remained in the employ of the said Knoxville Power & Light Company and said Tennessee Public Service Company from the date of said certificate, to-wit, July 18, 1927, up until on or about the 29th day of October, 1930, on which date complainant's employer terminated said employment, and complainant was never thereafter an employee of either the said Electric Bond & Share Company, the Knoxville Power & Light Company, or the Tennessee Public Service Company.

The answer further specifically denies that the complainant sustained an injury on or about November 1, 1928, or at any other time, which rendered him totally and permanently disabled, as averred in said original bill. It denies that the contract of insurance sued on contains the provisions averred and set out in the second section of the bill, and relies upon said group policy and said certificate to

show the contents thereof. The answer then proceeds to set out certain provisions contained in the group policy, with respect to the duty of the employer to report to the company in writing the names of all persons insured under the formula, not previously reported, who shall have ceased to be in its employ since the 20th day of the preceding calendar month, together with the date when each such employee left said employment. "The insurance hereunder as to each of such employees, shall be discontinued as of the date when such employee left the employ of the employer."

The answer alleges that, pursuant to said provision in the policy, the Knoxville Power & Light Company, on the 29th day of October, 1930, reported in writing to the defendant that the complainant, Andrew J. Bowen, was no longer in the employ of said employer, and thereupon directed the defendant to discontinue the insurance under said group policy upon the life of the complainant as of October 29, 1930; that, in accordance therewith, said insurance was discontinued and no further premiums were paid thereon to 'the defendant, and the complainant has not, since the 29th day of October, 1930, been insured under said group policy.

The answer specifically denies that complainant, while insured under said group policy, and prior to his sixtieth birthday, became totally and permanently disabled, as the result of bodily injury or disease, so as to be prevented from thereby engaging in any occupation and performing any work for compensation or profit. Certain other admissions and denials and allegations are set forth in the answer, but the above are sufficient to present the questions made in this court.

At the hearing of the cause, the chancellor sustained the original bill, holding and decreeing, among other things, as follows:

"2. That on or about the 1st day of November, 1928, and while in the employ of the said Knoxville Power & Light Company, the complainant sustained an injury which resulted in total and permanent disability, and the Court finds that from and after said date, the complainant was totally and permanently disabled within the meaning of the provisions of total and permanent disability contained in the policy of insurance.

"3. And it appearing that at the time of the filing of the bill in this cause, there were two monthly installments due the complainant, on which interest to this date amounts to the sum of $3.45, making a total of $61.05, it is ordered and decreed by the Court that the complainant Andrew J. Bowen, have and recover of the defendant Metropolitan Life Insurance Company, said sum of $61.05 and all the costs of this cause for which execution may issue."

To the action of the court in adjudging and decreeing liability on the part of defendant, the defendant excepted, and from said decree prayed an appeal to this court. It is further provided in the decree that, in case of appeal, all exhibits may be sent up in their original

form in lieu of copying the same into the transcript, and any and all exceptions to testimony to be noted on the margin of the depositions, together with the action of the court thereon.

The appeal has been duly perfected and errors assigned.

■ Appellee filed a petition for certiorari suggesting the diminution of the record, in that the clerk of the chancery court had failed to include in the transcript of the record the group policy No. 3323-G, filed with the answer of the defendant and marked Exhibit No. 1 to the answer. This matter was presented to this court when the case was called for hearing, and, by consent of parties by counsel made in open court, it was agreed that the suggestion of diminution be considered together with the cause on its merits. We will first dispose of that matter. Upon examination of the answer we find that it contains an averment as follows:

"That on the 1st day of January, 1927, it issued and delivered to the Electric Bond & Share Company its policy of group life insurance, No. 3323-G, by the terms of which the employees of said Electric Bond & Share Company and its associated and affiliated corporations, one of which was the Knoxville Power & Light Company, of Knoxville, Tennessee, were privileged to obtain insurance upon their lives in accordance with a schedule attached to and made a part of said group policy. A full, true and correct copy of said group policy is filed herewith, marked Exhibit No. 1 to this answer, and made a part hereof as fully as if copied herein."

It thus appears that this group policy, and in connection with which the certificate issued and delivered to complainant, was made an exhibit to the answer, but the same was not sent up with the transcript of the record. Since certain of the assignments of error, and contentions made thereunder, are directed to the failure of complainant to introduce in evidence or to exhibit with the bill this group insurance policy, which admittedly is a necessary part of the contract of insurance sued upon, we think the application for certiorari suggesting the diminution of the record in this respect should be and the same is accordingly granted, and the clerk of this court will issue said writ directing the clerk and master of the chancery court of Knox county, Tennessee, to properly certify and send up to this court the Exhibit No. 1 in its original form as filed to the answer of the defendant.

By the first assignment of error it is contended that the chancellor erred in overruling the first and second grounds of defendant's demurrer, because the original bill does not state a cause of action under the policy of insurance sued on in two particulars: (a) It does not allege that complainant, while insured thereunder, became totally and permanently disabled from engaging in any occupation or performing any work for compensation or profit; and (b) it does not

allege that three months before the filing of the suit, or at any other time, due proof of such disability was furnished to the defendant.

By the second assignment it is insisted that the chancellor erred in finding, and decreeing that the complainant on November 1, 1928, or at any other time while insured under the policy of insurance sued on, became totally and permanently disabled within the meaning of the provision of the policy of insurance sued on.

By the third assignment it is urged that the chancellor erred in not dismissing complainant's bill at his cost.

The fourth assignment presents the question that the chancellor should have dismissed complainant's suit because the group policy was not introduced in evidence, but this assignment has been withdrawn, and its withdrawal is so noted on the margin of the assignment of errors, over the signature of solicitors for appellant.

In the view we have taken of this case and the questions made on the appeal, and since the withdrawal of the fourth assignment of error, we deem it unnecessary to await the sending up and making a part of this record said exhibit No. 1 to the answer, the same being the group policy upon which the certificate was issued and delivered to complainant. However, it is important that this document should be sent up so as to complete the record, in view of the fact that it is clear that as an exhibit to the answer it was before the chancellor and properly considered by the chancellor, but the assignments of error may be considered and disposed of without the formal filing of this document at this time, and to prevent unnecessary delay in disposing of the questions made on this appeal.

As hereinbefore stated, the first assignment of error challenges the action of the chancellor in overruling the first and second grounds of defendant's demurrer. We again quote these two grounds of the demurrer, which are as follows:

"1. Because there is no equity upon the face of the bill.

"2. Because the bill states no cause of action under the policy of insurance exhibited to the bill against this defendant."

Numerous authorities are cited in support of the first assignment of error and the two propositions, (a) and (b), thereof. However, we are of the opinion that the first two grounds of the demurrer are too general, and not specific. By section 8784, Code 1932, which is a re-enactment of chapter 152 of the Acts of 1851-52, and carried into Shannon's Code by section 4655, on the subject of demurrer, it is provided:

"Demurrers only for substantial defects.—Demurrers for formal defects are abolished, and those only for substantial defects are allowed. All demurrers shall state the objection relied on."

In the case of Whittaker v. Whittaker, 10 Lea, 93, and in which this statute was under consideration, it was held that a demurrer, both at

law and in equity, must state the specific ground relied on, and no other objection will be noticed.

In neither the first nor second ground to the demurrer is the attention of the court called to the questions now made under the first assignment of error. In a long line of cases in which this same section of the Code was construed, it has been held that all demurrers for form have been abolished, and demurrers must state the objection relied upon, or in other words must be special. Kirkman v. Snodgrass, 3 Head., 370; McNairy v. Nashville, 2 Baxt., 251; Walker v. Cheatham, 1 Shan. Cas., 576; Ridley v. Ridley, 1 Cold., 323; Hobbs v. Memphis & C. R. Co., 9 Heisk., 873. In the last-named case it is held that the provision of the statute that "all demurrers shall state the objection relied on" means that the objection relied on must be clearly stated, so as to give notice, distinctly, to the adverse party of the defect in his pleading. It was further held in that case: "In other words, that the party should not be allowed to get the benefit of what is equivalent to a general demurrer, not pointing out the objection 'relied on,' under one which is special, and required to point out the objection. It would be idle to abolish general demurrers, and to require the objection 'relied on' to be stated, if it is but to mislead and mean nothing, and the party have all the benefit of a general demurrer under special objections made to the pleading in his demurrer."

This section of the Code applies to suits in equity as well as to suits at law. Finley v. McCormick, 6 Heisk., 392, and cases cited.

Nor do sections 4386 and 4388 of the old Code (new Code, secs. 10467, 10469), which provide, among other things, that a bill may be dismissed on motion, or upon demurrer, "for want of equity on its face," relieve the necessity of a definite statement setting forth the objections relied upon. The sections of the Code referred to will be construed in connection with section 8784, new Code (2934, old Code). This was specifically held and definitely stated in the case of Chesney v. Rodgers, 1 Heisk., 239.

We are of the opinion that there was no error in the action of the chancellor in overruling the demurrer, and in not sustaining the first and second grounds thereof.

The second assignment of error presents the real question to be considered and determined on this appeal. That is, whether or not the complainant on November 1, 1928, or at any other time while insured under the policy of insurance sued on, became totally and permanently disabled within the meaning of the provisions of the policy of insurance. On this subject, the certificate issued and delivered to complainant provides:

"Under the terms of the group policy mentioned on page 1 of this Certificate, any employee shall be considered totally and permanently disabled who furnishes due proof to the insurance company, that,

while insured thereunder and prior to his sixtieth birthday, he has become so disabled as a result of bodily injury or disease, as to be prevented permanently from engaging in any occupation or from performing any work for compensation or profit.''

The burden of proof is upon the complainant, to prove by a preponderance of the evidence that, while he was insured under this policy, and prior to his sixtieth birthday, he became ''so disabled, as a result of bodily injury or disease, as to be prevented permanently from engaging in any occupation or performing any work for compensation or profit.''

Numerous depositions were taken by the respective parties on the question of the nature and extent of complainant's disability. From the undisputed evidence it appears that complainant received a serious injury on November 1, 1928, while he was in the employ of the Knoxville Power & Light Company, and while he was insured under the group policy and the certificate which formed the contract of insurance between the parties. He had been an employee of the Knoxville Power & Light Company as a lineman's helper for about twelve years before he sustained the injury. The duties of that position were to assist in hoisting power poles, assembling cross-arms, and other work incident to the erection of power lines, but was not required to climb power poles, and his work was to be performed on the ground. On November 1, 1928, the complainant was knocked or fell from the motortruck of the Knoxville Power & Light Company while going to his work with a group of other employees. This fall resulted in serious injuries, all described in detail in the evidence. He was at once taken to a hospital, and was in the hospital for several weeks. He was then confined to his home, and unable to perform any labor for several weeks on account of the injuries. He sustained a broken rib and a fracture of the outer upper portion of the wall of the right ilium. This is the portion of the right hip upon which the belt rests. In all, he remained away from his work on account of the injuries for about three months. After that time he was employed by the same employer as a watchman. At the time he received the injuries, he was earning 35 cents per hour as a lineman's helper. He was paid 30 cents or 35 cents per hour while he was employed as a watchman when he returned to work. His duties as watchman required very little physical exertion. He continued in that employment for some time and until the construction work of erecting a transformer station under the Church street bridge in Knoxville was completed. He was transferred to the office and yards of the power and light company on Fifth avenue, by the same employer, where he was employed as a night watchman continuously until about April, 1930, and received the same salary or wages as night watchman at this place that he received as night watchman at the former place where he was employed as watchman by the same employer. About April 1, 1930,

the Phoenix Utility Company, another one of the subsidiaries of the same corporation, took over the work of erecting and maintaining all of the power lines of the corporation, and on or about April 1, 1930, the complainant was transferred to the employ of the Phoenix Utility Company, where he was assigned the work of a groundman at a wage of 35 cents per hour. While there is some conflict in the evidence as to his exact physical condition at the time he undertook this last employment, we think it is clear from complainant's cross-examination, as well as from the evidence of other of his witnesses, including the foreman under whom he worked, that from about April 1, 1930, until about the last of October, 1930, while he was employed as a groundman, his work in the main was heavier than before the accident resulting in his injuries. He admits on cross-examination that during that time the duties of his employment required considerable manual labor and physical exertion. However, he states it occasioned him considerable pain to perform the work to which he was assigned. He admitted, however, that he showed gradual improvement all the time after he returned to work until the latter part of October, when he was discharged. We here quote from his evidence on cross-examination:

"Q. Now, the first job that they gave you after you were hurt and able to go back to work was at night watching at the Church Street Bridge? A. Yes.

"Q. Out in the open? A. Yes, and I kept a big fire there, you know, would have to keep a good fire.

"Q. What time of the year was it you went on that job, in the winter time? A. Yes, it was in the winter, but I don't recall what time, I don't know what date, but it was in the winter time.

"Q. And about how long did you stay on that job down at the Church Street Bridge. A. Well, sir, I would not say, I don't recollect.

"Q. What were your duties? A. I just sat there. I had not a thing in the world to do but to sit down there and watch after their stuff there,—I was just across the street there where they were at a garage, the house was built under the bridge where I stayed in.

"Q. And how much did they pay you while you were on that job? A. It was 30c or 35c an hour, I forget which.

"Q. And how much were you making before you were hurt? A. I made 40c or 35c whichever it was.

"Q. 35c an hour? A. Yes.

"Q. And you made either 30c or 35c an hour on the first job you had after you went back to work? A. I don't recollect what they paid me on that.

"Q. After the power and light company had finished this Church Street job, where did you go? A. I stayed at the office of a night, watching around there.

"Q. Out at the car barn? A. Yes.

"Q. And you were night watching out there? A. Well not the car barn but under the bridge where they have the line department there.

"Q. And what were your hours while you were on that job on Magnolia? A. Well, I stood around there in front of the building and answered the phone in case it rung and in cases usually like that they made us sweep up the building once in a while if it was dirty.

"Q. How much did they pay you while you were on that job? A. Like I said, I don't know whether they gave me 35c or not.

"Q. How long did you stay on that job out at the office? A. I stayed there for quite a litle while, I don't know how long.

"Q. Now, you had that job when? A. In the summer of 1929, I believe.

"Q. Hot weather? A. Yes, I think it was.

"Q. Were you there practically all of that summer? A. I was there a good while, but as I stated I don't recollect just how long.

"Q. Now, during that time while you were night watching your injuries were getting better all the time? A. Well, I could not say they were. I have suffered the same ever since I was hurt as I am now. I could not say that they were.

"Q. After you had been night watching for several months the company sent you out with a crew of linemen? A. No, not the Power and Light Company did not.

"Q. What happened then when you left the job at the office? A. Well, the Power and Light Company, it was changed at that time and they put me with the Phoenix Utility that took charge of that work.

"Q. They transferred you from the Power and Light Company to the Phoenix Utility Co.? A. Yes.

"Q. And what job did they put you on after that? A. I went out and helped on the line work, I was not supposed to dig holes or anything.

"Q. Well, you—(Counsel interposed and the witness continued)

A. They put me out there to fix cross-arms and to help around or something like that. I done the best I could do, as to what they told me to do. What little I could do I did it.

"Q. Now after you changed over to the Phoenix Utility Company how much did they pay you per hour? A. Well, I reckon it ran on the same thing as it was, 35c an hour I think it was out there.

"Q. And you continued on that job as I understand it on up until you quit work? A. Well, not all of the time, I did not, because maybe I would be off a week or such a matter, but I would stay in the building or at the pole yard over there looking after getting poles for them to take out.

"Q. Now, when they didn't need you out on the road with the linemen, they put you back on the yard? A. Yes, just anything round that way I could do that they wanted to put me at.

"Q. And during all of that time your physical condition was improving very much? A. No, not much.

"Q. Well, it improved a little during that time? A. It did very little.

"Q. You got stronger? A. Yes, but mighty little though.

"Q. And when you started to go back to work for the power and light company and for the Phoenix Utility Company your condition did not get any worse but continued some to improve, there was a little improvement? A. Well, there might have been a very little.

"Q. Now, the last day you worked out there you did go on the road with the line crew? A. Yes, with the crew that day the best I recollect.

"Q. And you went down there on the truck with the crew that morning? A. Yes.

"Q. And worked that day? A. Yes. I recollect what I did the last day, I was there.

"Q. What was it? A. I put bolts in the cross arms on the ground. I recollect that as well as if it was yesterday.

"Q. Now, when you were laid off out there how many other men were laid off at the same time? A. I would not say, because I do not recollect.

"Q. There were several? A. Well, there were some, but I don't recollect how many.

"Q. How soon after you quit work for the Phoenix Utility Company in October, 1930, did you start working at the tobacco warehouse? A. Well, I don't recollect just how long it was that I put those numbers on these baskets for them—I don't recollect how long it was after that.

"Q. How many people did you have to go to before you got the job with the tobacco warehouse? A. One.

"Q. You got the first job you applied for? A. Well, I didn't get that job at that time, but he told me when things opened up to come down there, and if they had anything they would give it to me."

The above-quoted evidence of the complainant is sufficient to show that in about three months after he received the injuries he was able to accept employment as night watchman, and continued in that employment for several months, and until the Phoenix Utility Company took over the construction and maintenance work, when he was transferred to that company where he was employed as a "ground man." The complainant evidently seeks to show that his duties as a groundman were comparatively light work, and that his physical condition was such that he could not do heavy manual labor. However, the deposition of Burell Howser, the foreman under whom complain-

ant worked while he was in the employ of the Phoenix Utility Company from April, 1930, through October, 1930, was taken by complainant and introduced by complainant in evidence. This witness testified on cross-examination in part as follows:

"Q. Do you know whether or not Mr. Bowen was able to engage in his former occupation that he was performing prior to the time of the accident? A. I don't understand that, I don't know what you mean.

"Q. Do you know what Mr. Bowen did before he was injured? A. Well, he done the same kind of work except he was waiting on the lineman. He didn't have any hard work.

"Q. He was known as a lineman's helper? A. Yes.

"Q. And when he worked with you he didn't have any hard work to do? A. Well, it was hard work for him.

"Q. Your work was harder than the work he had been doing? A. Yes, heavier work.

"Q. Heavier work? A. Yes.

"Q. I will ask you if Mr. Bowen was ever out there on the job working at times when it would be necessary for him to get off and rest a while while he would be performing his duties? A. Yes, he has, whenever he felt it was hurting him."

This witness further testified on cross-examination, referring to the character of work that Bowen did while he was employed by the Phoenix Utility Company:

"Q. During that time he dug holes for power poles? A. He dug holes.

"Q. Yes, an helped to set poles? A. Yes.

"Q. And tamped them in the ground? A. Yes.

"Q. He did the tamping? A. Yes.

"Q. And helped remove and lift power poles? A. Yes. . . .

"Q. And Mr. Bowen was engaged in helping unload those poles off the truck and helping hoist them and put them in the pole line, about how deep would you set these poles in the ground? A. All the way from five to eight feet, depending on the length of the pole.

"Q. Now, these complaints that Mr. Bowen made about his injuries, they were when he first joined your crew after he got hurt? A. Well, all along.

"Q. From time to time? A. Yes, on some days he would go along and work a full day and I would not hear anything out of him. Some days he would feel better than others.

"Q. And when he was not working with your crew, and when your crew didn't have any work to do, Mr. Bowen would loaf around the place of business of the power and light company down there under the Magnolia Avenue viaduct at that place of business there? A. Yes.

334

"Q. And would do a little work around the shop and yard? A. Well, I don't know whether he was there or not because I was not there.

"Q. Well, he worked for you practically every day that your crew worked? A. Yes.

"Q. You never had to report Mr. Bowen as being disabled? A. No, I never did.

"Q. Or unable to do his work there? A. No, I never did.

"Q. And you never discharged Mr. Bowen because he was unable to do his work there? A. No.

"Q. You were never instructed by any of your superiors to discharge him for that reason? A. No.

"Q. He didn't leave the employ of the Phoenix Utility Company because he was not able to do his work? A. I don't know whether they laid him off on that account or not.

"Q. The last day he was there with the company he did a full day's work? A. Yes, I reckon so. If a man comes in and feels bad I don't report him if he don't stand up and make a strong man all day. I feel bad some days myself. . . .

"Q. And about how often did that happen when he would have to rest a while? A. I don't know how often it was, it would not be every few hours, of course.

"Q. And it would not be every few days? A. Well, not more than that as well as I remember now. . . .

"Q. Now, when he would make these complaints about being tired or having pain he rested a little while and then would come back on the job? A. Yes.

"Q. He never laid off as much as a day on that account? A. No.

"Q. Or half a day? A. I don't remember him laying off any day on that account."

O. P. Young, the construction engineer in charge of the operation for the Phoenix Utilities Company, a witness for the defendant, testified, in substance, that he had not known the complainant prior to the time he was transferred to the Phoenix Utility Company, but came in almost daily contact with him from April, 1930, until he dispensed with his services the latter part of October, 1930. He testified in part as follows:

"Q. Mr. Young, from April, 1930, on as long as Mr. Bowen was in the employ of the Phoenix Utility Company what did you observe in regard to his ability to perform the duties of a groundman? Just tell what you saw him do in performing his work, and what disability, if any, you observed, explain in detail what you know about it? A. I saw him do the work of an average man, that is about the best explanation I could give. I saw him digging holes and tamping up holes, waiting on the linemen.

"Q. Did you notice any difficulty he encountered in doing that work? A. No.

"Q. Did he ever complain to you that he was not able to do the work? A. I don't recollect that he did.

"Q. Approximately how long after April, 1930, did he continue to work for the Phoenix Utility Company as groundman? A. Until he was discharged in October, 1930, but I think during that time he was off a couple of weeks, somebody mentioned that to me today, that he was off a couple of weeks during that time and he might possibly have laid off at other times a day or so, something like that.

"Q. Do you recall the occasion when Mr. Bowen left the employ of the Phoenix Utility Company? A. I recall when we discharged him.

"Q. Just tell what took place and when that happened? A. Well, that morning that we discharged him, discharged Bowen and about four other groundmen, I went out into the line department yard and explained to them that because work had gotten so slack that I had to let them go.

"Q. Was Mr. Bowen in the group that you were speaking to on that occasion? A. Yes.

"Q. Up to that time had Mr. Bowen ever made any complaint to you that he was not physically able to do his work? A. As I stated, if he did I don't recollect it, let me say that sometimes the groundmen speak to me about this and that, but I don't recollect it.

"Q. Was he discharged on account of any physical disability he might have? A. No, I did not discharge him because of any physical disability."

It is also shown by this witness that by October, 1930, the force of men employed in similar employment as complainant had been reduced from about forty-five to about twelve, as the result of the falling off of business and economic conditions.

Mr. McCloud, cashier for the Phoenix Utility Company, and who kept the employment records of all employees of the company, filed as exhibit to his deposition the employment card of complainant. During the seven-month period this employment card showed that complainant did not work from July 21, to August 4, 1930, and only lost eight days with the exception of that two weeks. The card also showed that he worked some days as long as fourteen hours and usually nine hours. The record contains the evidence of certain medical witnesses. Dr. Abercrombie made an X-ray examination of complainant on September 26, 1931, about three years after the accident. The X-ray examination disclosed an old fracture mid-portion of the tenth rib on the right side or opposite the axillary line, with apparently good union and in good position; also an old fracture of the outer upper portion of the wall of the right ilium, with good union and good position. It also showed that there was a moderate amount

of spondylitis, described as bone lipping, on the lower fifth dorsal entering the lumbar spine, which was somewhat more marked near the eleventh and twelfth dorsal and first lumbar vertebra, but not complete ankylosis; there was apparently a complete bony ankylosis of the sacroiliac joints, more marked on the right than the left. The hip joints and other bones of the pelvis were normal. From the evidence of this doctor and other evidence in the record the condition showing spondylitis of the lower fifth dorsal entering the lumbar spine, referred to as a bony lipping or a new bone grown out between the joints of the spine, was probably not the result of the injury received in the fall. This condition, it appears, frequently comes with mature age, and without any injury, and does not usually operate as a disability. It is shown that a certain amount of spondylitis is usually found in the spine of normal persons after middle age is reached. However, Doctor Abercrombie stated that, with this condition of the spine, "there might be marked disability or no disability at all," and from the X-ray examination he could not state whether the spondylitis was interfering with the complainant in performing his normal activities. The fractured bones resulting from the fall of complainant seemed to have healed completely, and not giving any trouble at the time Dr. Abercrombie made the examination.

On cross-examination the following hypothetical question was submitted to Dr. Abercrombie: "Q. From what you saw of Mr. Bowen's condition in September, 1931, and considering what your X-ray examination disclosed, and considering further the fact that Mr. Bowen was injured in November, 1928, and was off from work for approximately three months following that injury and then at the end of that time obtained employment as a night watchman, working constantly at that job for some months, and then obtained a job with the line crew of the Power & Light Company doing ground work involving no climbing, and that he followed that occupation up until October 30, 1930, at which time he lost his job on account of the depression,—considering all those things, Doctor, was it your opinion or is it your opinion that in September, 1931, when you examined Mr. Bowen that he was totally disabled so that he could not engage in any gainful occupation for which he was fitted? A. What occupation is he fitted for—may I ask that question?

"Q. I have named several that he engaged in. A. I would not think that he was permanently, totally disabled from the question you have asked me when I X-rayed him in September, 1931.

"Q. And you base that answer on the facts that I have recited to you and on the result of your X-ray examination? A. Yes."

Dr. B. V. Howard made one examination of complainant on October 5, 1931. This was the only time that Dr. Howard ever examined the complainant. He stated complainant complained of pain in his back and legs and feet, and suffered more or less stiffness in the lumbar

region of his spine. However, he found, as the only objective symptom, some stiffness in his spine. This was evidently the stiffness attributed to the ankylosis or sacroiliac joint, referred to by Dr. Abercrombie from his X-ray examination. Dr. Howard did state, however, that he thought the complainant was permanently and totally disabled from performing manual labor.

An examination of the evidence of Dr. Howard on cross-examination shows a disposition upon his part to evade direct answers to the hypothetical questions submitted to him.

Dr. Clint H. Morgan, a witness for complainant, examined complainant on September 15, 1931. He testified that the condition of complainant's spine rendered him totally and permanently disabled. He attributed this disability to complainant's difficulty in using his lower limbs.

It appears that the evidence of Dr. Morgan was based more upon the subjective than objective symptoms. He only saw complainant but the one time.

Dr. C. F. Mooney made a very thorough examination of complainant on October 19, 1931. He had complainant to strip and examined his heart, lungs, and blood pressure, and had him to walk about the room and take exercise in his presence. He testified that he found his heart, lungs, pulse, and blood pressure were normal. He found no deformity of any character. Complainant gave Dr. Mooney a history of his activities since he received the injuries, and up to the time he was examined. He testified that he also examined the X-ray pictures, and from the personal examination, the subjective symptoms and the objective symptoms, and the condition of the bones as shown by the X-ray, that he was of the opinion that there was nothing in his physical condition to prevent him from doing the usual work of a laborer without injury or pain.

It would but unnecessary prolong this opinion to go into a more detailed analysis of the evidence. However, we are of the opinion that within a few months after complainant received his injuries he was physically able to accept employment and perform all the duties incident to his employment as a night watchman. Thereafter, he went back to the work that he was doing at the time he received his injury, except probably that from April, 1930, to the latter part of October, 1930, his work was even more strenuous than before he received the injuries. He received practically the same wages after he went back to work. It is also clear from the record that his employment was not discontinued on account of his physical condition, but because it became necessary for the employer to lay off many of its employees on account of the economic depression and general slump in business. He later obtained employment in a tobacco warehouse. We also think it clear that his lack of employment after he was let out by the power and light company was due to the general

condition of unemployment, and not to any physical inability upon the' part of complainant to perform usual day labor. We do not think that the facts of this case, as disclosed by the record, brings it within the decision of the Supreme Court in the case of Pacific Mut. Life Ins. Co. v. McCrary, 161 Tenn., 389, 32 S. W. (2d), 1052.

In that case the insured was practically confined to his home on account of his physical condition, although at intervals he transacted some business with his tenants at his home, and in a measure directed the operations of his farm, but was totally disabled from pursuing his vocation as a practicing physician.

In the case of Metropolitan Life Ins. Co. v. Noe, 161 Tenn., 335, 31 S. W. (2d), 689, 690, the same provision was contained in the policy contract sued on as in the policy sued on in the present case. In that case the court said:

"In insurance parlance the phrase 'totally and permanently disabled' contemplates a physical condition at the time of the claim which reasonably convinces the judging authorities that (a) the subject is then totally disabled, and (b) will so remain for life.

"These are issues of fact to be determined on the evidence adduced in each individual case. The jury or judge may look to the physical appearance of the claimant and the history of the case, and consider lay and expert testimony and determine whether (a) the disability is total, that is, incapacitating the claimant for any remunerative occupation; and (b) whether it will be permanent, that is, lasting or continuous, as distinguished from temporary merely, with a promise of affording a probability of recovery."

In the case of Metropolitan Life Ins. Co. v. Barela (Tex. Civ. App.), 44 S. W. (2d), 494, 497, in construing language similar if not identical with the provision contained in the instant contract, the court said:

"But the policy does not indemnify the insured against being laid off, or inability to get work, but against bodily injury resulting in total inability to perform any work for compensation or profit. The fact that Barela, after recovering from the immediate effects of his injury, worked for about two years for the same employer as before his injury, and with apparent satisfaction to both employer and employee, and was let out only because of conditions other than his ability and efficiency to work, demonstrates his ability to work for profit at some kind of work."

Many cases from other jurisdictions could be cited to the same effect, but after all each case must be determined upon its own facts. Notwithstanding some of the medical testimony introduced was to the effect that, in the opinion of these doctors (Dr. Morgan and Dr. Howard), the complainant was permanently, totally disabled from performing labor in September, 1931, when they made the only examination of complainant, the fact remains that under the undis-

puted evidence in this record complainant did return to work within three months after he received his injuries, and continued in the employ of the same employer practically continuously for nearly two years before he was discharged on account of economic conditions and not because of any physical disability upon the part of complainant. We are further of the opinion that by a decided preponderance of the evidence, that from April, 1930, to October 30, 1930, a period of about seven months, complainant was practically continuously employed as a groundman and as a part of his duties he assisted in digging holes in which to set poles, and in tamping the poles, and in the usual work incident to his employment, and during which time he received the same wages that he received prior to his injuries. After this he was employed for a short time, at least, in the tobacco warehouse, and since has sought to obtain employment elsewhere, but his failure to do so was because of the general condition of unemployment, and not due to his physical inability to work.

We are constrained to disagree with the finding and the decree of the learned chancellor, in his holding to the effect that the complainant was rendered totally and permanently disabled from performing work or earning wages as the result of the injuries sustained, or for any other cause. We are of the opinion that the second assignment of error must be sustained, and the decree of the chancellor reversed and the suit dismissed at the cost of appellee.

Heiskell and Anderson, JJ., concur.